**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **18 CR 667-1** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| | ) | |
| **GARY HOWARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Defendant Gary Howard moves to suppress his post-arrest statements as well as the fruits of two consent searches [52-1], arguing that he was coerced into waiving his *Miranda* rights and consenting to the searches. For the reasons stated herein, the Court grants his motion in part and denies it in part.

## Background

On July 2, 2018, Howard and Fowobi George were arrested in the parking lot of a furniture store while meeting with a DEA confidential source ("CS") to finalize a cocaine transaction. Def.'s Mot. Suppress at 1–2, ECF No. 52-1. While he was being arrested, Howard told DEA Special Agent Anthony Anglada that he was working as an informant for Homeland Security Agent Anthony Sabaini. *Id.* at 2. Anglada and Howard then went in Anglada's car and called Sabaini on speakerphone. Gov't's Resp. Mot. Suppress at 4, ECF No. 58. After the call, Anglada drove Howard to the

Berwyn Police Station. *Id.* It is disputed both what was said during the phone call and what Howard said to Anglada during the subsequent car ride.

At the police station, Howard again had the opportunity to speak with Sabaini on the phone. Def.'s Mot. Suppress at 3. Following that conversation, Howard agreed to cooperate with the government's interrogation, signing a written waiver of his *Miranda* rights and providing written consent for searches of his home and cell phone. Gov't's Resp. Mot. Suppress at 5–7.

Howard now seeks to suppress his post-arrest statements as well as the fruits of the searches of his home and cell phone. Specifically, he contends that his post-arrest statements and his consents to the searches were involuntary because Sabaini—with whom Howard had worked for years—instructed him to cooperate with the DEA and falsely promised him that he would not be prosecuted if he cooperated. Def.'s Reply Mot. Suppress at 4, ECF No. 61-1.

Since the filing of Howard's suppression motion, the government has represented that at trial it will not use or rely on any statements Howard made at the police station. Evid. Hr. Tr. at 2–3, ECF No. 90. Moreover, the government has stated that it will not rely on Howard's consent to search his house or his phone and instead argues that those searches should be upheld under the inevitable discovery doctrine. *Id.* Thus, the Court now addresses (I) whether Howard's post-arrest statements to Anglada in the ride to the police station must be suppressed, and (II) whether the searches of Howard's home and cell phone may be upheld based on inevitable discovery.

## Discussion

### I. Howard's statements in the car

#### A. Legal standard

Under the Due Process Clause of the Fifth Amendment, the Court may admit a confession only if the accused made it voluntarily. *See, e.g.*, *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). A confession is voluntary if "the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Id.*; *see also United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). The government bears the burden to establish by a preponderance of the evidence that a confession was voluntary. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

There is no bright line test to determine whether a confession was given voluntarily. Instead, the Court must consider the "totality of the circumstances," including factors such as the presence and extent of coercive activity, the nature and duration of questioning, and the defendant's "age, intelligence, education, and experience with the criminal justice system." *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997).

And while "police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties," *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990), false promises by government agents can impede a defendant's ability to confess voluntarily. The Seventh Circuit has explained, "[t]he reason we treat a false

promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise has the unique potential to make a decision to speak irrational and the resulting confession unreliable." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). More specifically, a false promise can "destroy[] the information that [a defendant] require[s] for a rational choice." *Rutledge*, 900 F.2d at 1130.

To this point, a promise by a government agent not to prosecute in exchange for a defendant's agreement to make additional statements can be sufficiently coercive to violate the defendant's Fifth Amendment rights. *See United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009) ("An empty prosecutorial promise could prevent a suspect from making a rational choice by 'distorting the alternatives among which the person under interrogation is being asked to choose.'" (quoting *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996))); *see also United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) ("We might have a more difficult case had Furnas gone further and promised the Kontnys they would not be prosecuted if they played ball with him, for that conceivably is the kind of false promise that might induce a rational person to rely."); *Rutledge*, 900 F.2d at 1130 ("If the officers, fully intending to use anything Rutledge said against him, had said to him, 'Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you,' then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary.").

### B. Analysis

The Court concludes that the government has not met its burden to establish the voluntariness of Howard's alleged statements during the car ride with Anglada.

At the evidentiary hearing pertaining to the instant motion, competing testimony was presented as to what was said during the phone call between Howard, Anglada, and Sabaini that preceded Howard's statements to Anglada on the drive to the police station. Specifically, Anglada testified that the phone call merely consisted of him asking Sabaini if he knew where Howard was and if Howard was working that day on a Homeland Security operation, with Sabaini answering in the negative for both questions and adding that he did not want to talk because he was with his family. *See* Evid. Hr'g Tr. at 75–76. Sabaini, on the other hand, testified that during the call Anglada said that Howard "could work it off if he cooperated," after which Sabaini instructed Howard to cooperate. *Id.* at 121–23.

The Court concludes that, under the factual scenario described in Sabaini's testimony—which the Court finds credible and gives substantial weight—the government has failed to meet its burden to show that Howard's statements were voluntary. The government is correct that encouraging a suspect to cooperate does not, by itself, violate that suspect's constitutional rights. *See, e.g.*, *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) ("[T]he Supreme Court allows police interrogators to tell a suspect that 'a cooperative attitude' would be to his benefit."); *United States v. Ramirez*, 112 F.3d 849, 853 (7th Cir. 1997) ("Merely pointing out, what is anyway obvious, that cooperation with the police can result in a reduced

sentence or other concessions down the road is not a promise and is not calculated to prevent the suspect from rationally considering whether or not to speak."). But there is more here.

During the telephone call, Anglada stated that Howard could "work . . . off" the charge "if he cooperated," and Sabaini reinforced this sentiment by instructing Howard to cooperate. Evid. Hr'g Tr. at 121–23. Given that Howard and Sabaini, as Sabaini acknowledged, had a longstanding relationship through which Howard was already "work[ing] . . . off" a separate transgression rather than being prosecuted for it, Howard reasonably would have understood Anglada's use of the phrase "work it off" to mean the same thing it had meant in his dealings with Sabaini—that is to say, if Howard cooperated, he would not be prosecuted. This certainly was consistent with Sabaini's understanding, based upon his discussions with Anglada, that Howard could "get himself out of it by cooperating." *See* Evid. Hr'g Tr. at 114. That Howard also would have understood the interaction this way is bolstered by the fact that Howard and Sabaini previously had discussed "working a case against the people that were involved at the furniture store." *See* Evid. Hr'g Tr. at 110 (acknowledging that Howard had earlier "discussed the possibility of working a case against the people that were involved at that furniture store").

Given the totality of the circumstances, the statements made by Sabaini and Anglada during the first phone call would reasonably be understood as signaling to Howard that he "would not be prosecuted if [he] played ball with [the government]." *Kontny*, 238 F.3d at 818. Accordingly, Sabaini's and Anglada's statements to Howard

during that telephone call, taken together, constituted an improper false promise, rendering Howard's subsequent statements involuntary. *Cf. United States v. Walton*, 10 F.3d 1024, 1026 (3d Cir. 1993) (reasoning that an agent's prior relationship with the defendant blunted the adversarial nature of their conversation).

As for Anglada's account of the telephone conversation, his testimony was not inconsistent with Sabaini's account, but lacked some of the additional details that Sabaini recounted about the conversation when questioned by the Court. Accordingly, the Court gives Sabaini's account more probative weight.

For these reasons, the Court finds that the government has not established by a preponderance of the evidence that the statements Howard made during the car ride were voluntary. *See Carter*, 910 F.2d at 1529. Howard's statements during that ride are thus suppressed.

## II. The search of Howard's home and cell phone

Howard also requests that the Court suppress the items that the government discovered during the searches of his residence and cell phone. Although the government first argued that Howard had consented to the searches while he was at the station, the government has wisely abandoned that theory and relies now on the inevitable discovery doctrine, based on the surveillance that law enforcement agents performed on Howard prior to his arrest as well as facts obtained from George.

### A. Legal standard

"The inevitable discovery doctrine provides that illegally obtained evidence will not be excluded if the government 'can establish by a preponderance of the evidence

that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Haldorson*, 941 F.3d 284, 293 (7th Cir. 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "To satisfy this burden, the Government must demonstrate that two criteria are met: First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009); *see also United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant . . . independent of the search.").[1]

**B. Analysis**

Turning first to the search of Howard's residence, DEA Special Agent Brandon Rodekohr, one of the lead case agents on the investigation that led to Howard's arrest, testified that, after initially meeting with George and the CS at the furniture store on July 2, 2018, Howard left the store in order to get money for the drug transaction (as conveyed by the CS). Evid. Hr'g Tr. at 14. From there, surveillance followed Howard to an apartment complex, which he entered only to return to his car empty-

[1] Howard argues that the Court, in conducting an inevitable-discovery analysis, should prominently consider "the social interest" in the unlawful search and how "flagrant and unnecessary" the law enforcement misconduct relating to the search may have been. Mem. in Supp. of Mot. to Suppress at 13–14, ECF No. 96. This argument—which Howard makes solely by discussing the facts of *Nix v. Whiteside*, 467 U.S. 431 (1984)—is unpersuasive as it does not account for, or even reference, the past three-and-a-half decades of doctrine regarding inevitable discovery in the Seventh Circuit and beyond.

handed. Howard then proceeded to a house and drove his car into the garage. Five minutes later, he drove his car out of the garage and returned to the furniture store without making any stops. *Id.* at 17–19.

At the furniture store parking lot, Howard stated to George and the CS (who was wearing a wire) that "this right here I got, this is a hundred—this is only for half" before adding that he would later "go grab the other hundred and forty." Consistent with these facts, the agents recovered a backpack "containing a large amount of U.S. currency" from Howard's car upon his arrest. *Id.* at 24.

Following the arrest, DEA agents were informed by Howard's landlord that the house was in fact Howard's residence, and they secured the residence in anticipation of obtaining a search warrant. *Id.* at 16, 28. It was then that the agents were informed that Howard had consented to the search and proceeded into the house. *Id.* at 29. Rodekohr further testified that he would have applied for a warrant had they not ultimately received the consent to search, and also testified that he contacted Assistant United States Attorney Nicholas Eichenseer before, during, and after the operation to keep him updated and let him know about the possibility of applying for a search warrant. *Id.* at 29, 30–31; *see, e.g.*, *United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) (upholding a warrantless search on inevitable-discovery grounds in part because "Agent Dempsey specifically testified that he would have secured a warrant if Pelletier refused consent. Indeed, Agent Dempsey also testified that, during the interview, he called both state and federal law enforcement authorities to start pursuing a search warrant, should it become necessary later.").

Based upon the record, the Court finds that the government had probable cause to conduct a search of Howard's residence and that it would have conducted a lawful search pursuant to a warrant, absent Howard's statements to law enforcement or his written consent to search the home. *Cf. United State v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (concluding that police inevitably would have sought a warrant to search a room, as "it would have been foolish not to want to look . . . there").

A similar analysis applies to the search of Howard's cell phone.[2] First, the government has established that there existed probable cause of finding evidence of drug trafficking on Howard's phone. George, during his post-arrest interview on July 2, 2018, told DEA agents that he had been in touch with Howard earlier in the day, including speaking on the phone with him that morning about the planned transaction. Evid. Hr'g Tr. at 33. Relatedly, Howard was spotted holding a cell phone in his hand when he showed up for the deal outside the furniture store, *id.* at 13. Moreover, a search of George's phone (with his consent) revealed text messages, WhatsApp messages, and phone calls between George and Howard in the days and hours surrounding the planned transaction, with certain messages clearly in service

---

[2] The Court is unpersuaded by Howard's argument that *Riley v. California*, 573 U.S. 373 (2014), stands for the proposition that the inevitable discovery doctrine does not apply to searches of cell phones. Mem. in Supp. of Mot. to Suppress at 11–12. *Riley* merely concluded that cell phone data does not fall within the search-incident-to-arrest exception to *the warrant requirement*, 573 U.S. at 403; it said nothing to suggest that the search of such data could not fall within the inevitable-discovery exception to *the exclusionary rule*. *See, e.g.*, *United States v. Robinson*, No. 15 CR 5, 2015 WL 4623551, at *3 (E.D. Wis. Aug. 3, 2015) (concluding that the cell-phone search at issue was consistent with *Riley* before adding, in the alternative, that the evidence obtained from the search would be admissible under the inevitable-discovery exception).

of coordinating that transaction. For instance, just minutes before the arrest, George texted Howard, "I have made it easier. Just do the ten as agreed. You don't have to go anywhere to inspect," and Howard—who had just returned to the furniture store parking lot after his drive to the apartment complex and his residence—responded, "Come to the car." *Id.* at 40–41. At the same time he sent that message, Howard also called George through WhatsApp, with George's ringtone being picked up by the CS's wire. *Id.* at 42.

Furthermore, the Court is persuaded that the government not only could have, but would have, pursued and obtained a warrant to search Howard's cell phone. *See Marrocco*, 578 F.3d at 640 ("It would be unreasonable to conclude that, after discovering all this information, the officers would have failed to seek a warrant."). To this point, Rodekohr testified that he would have pursued a search warrant for the phone had Howard not consented to a search, and that he had been in touch with AUSA Eichenseer about the possibility of obtaining search warrants. Evid. Hr. Tr. at 43; *cf. Pelletier*, 700 F.3d 1109, 1117. Thus, the Court concludes that the government has satisfied the requirements of the inevitable discovery doctrine with respect to the search of Howard's cell phone.

## **CONCLUSION**

For the foregoing reasons, Howard's motion to suppress is granted in part and denied in part. Specifically, the Court grants Howard's request to suppress the statements that he made in the car ride with Anglada, but denies his request to

suppress the items recovered from the agents' searches of Howard's home and cell phone.

**IT IS SO ORDERED.**

**ENTERED: 2/11/20**

**John Z. Lee**
**United States District Judge**