UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 18-cr-667 |
| ) | |
| GARY HOWARD ) | Hon. Steven C. Seeger |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Gary Howard's motion for acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33 (Dckt. No. 408) is hereby denied.

### Background

The Court assumes that any interested reader is familiar with the background of the case from the Court's prior orders. *See, e.g.*, 5/6/24 Mem. Opin. & Order (Dckt. No. 342); 5/6/24 Mem. Opin. & Order (Dckt. No. 343).

In a nutshell, Defendant Howard, a confidential informant for Homeland Security Investigations, was charged with four drug offenses. He went to trial, and the jury convicted him on three of the four counts.

The superseding indictment alleged that Howard was involved in two narcotics transactions in 2017 and 2018. Counts 1 and 2 involved an alleged attempt to purchase cocaine in 2018, and Counts 3 and 4 involved an alleged sale of cocaine in 2017.

The 2017 incident involved Howard allegedly selling cocaine to a DEA confidential source on January 13, 2017. Count 3 charged Howard with conspiracy to knowingly and intentionally distribute cocaine. *See* Superseding Indictment, at 4 (Dckt. No. 101). Count 4 charged Howard with knowingly and intentionally distributing and causing to be distributed cocaine. *Id.* at 5.

The 2018 incident involved Howard allegedly attempting to buy 10 kilograms of cocaine from a different DEA confidential source on July 2, 2018. *See* Def.'s Mem. in Supp. of Mtn. for Acquittal, at 15 (Dckt. No. 458); Gov't's Resp., at 2–3 (Dckt. No. 451). Count 1 charged Howard with conspiracy to knowingly and intentionally possess with the intent to distribute five or more kilograms of cocaine. *See* Superseding Indictment, at 1 (Dckt. No. 101). Count 2 charged Howard with attempting to knowingly and intentionally possess with intent to distribute five or more kilograms of cocaine. *Id.* at 3.

Howard pleaded not guilty.

Judge Lee presided over the case for the first few years, before his departure to the Seventh Circuit. Judge Lee made a number of important rulings before trial.

The rulings included (1) denying Howard's motion to dismiss the indictment under the Speedy Trial Act (Dckt. Nos. 63, 75); (2) granting Howard's motion to suppress certain post-arrest statements (Dckt. No. 99); (3) denying Howard's motion to quash the arrest and suppress evidence of searches of his home and cell phone (Dckt. No. 99); (4) denying Howard's motion to dismiss the indictment based on vindictive prosecution and the public authority defense (Dckt. No. 171); and (5) denying Howard's motion to sever Count 1 and Count 2 (the July 2018 incident) from Count 3 and Count 4 (the January 2017 incident) (Dckt. No. 180).

The case was reassigned to this Court on September 8, 2022 (Dckt. No. 233).

Before trial, this Court ruled on a number of motions *in limine*. *See* 11/7/22 Minute Order (Dckt. No. 245); 9/6/23 Minute Order (Dckt. Nos. 278–285); 5/3/24 Minute Order (Dckt. No. 337); 5/6/24 Mem. Opin. & Order (Dckt. No. 342); 5/6/24 Mem. Opin. & Order (Dckt. No. 343); 5/13/24 Minute Order (Dckt. No. 362).

The Court presided over a week-long jury trial from May 13 to May 20, 2024. *See* 5/13/24 Minute Order (Dckt. No. 363); 5/20/24 Minute Order (Dckt. No. 393).

The government presented a significant collection of evidence, including testimony from witnesses who participated in the alleged transactions. The government offered footage from each incident. Howard took the stand in his own defense.

During trial, the Court ruled on a number of other motions *in limine*. *See* 5/13/24 Order (Dckt. No. 362); 5/16/24 Order (Dckt. No. 375); 5/16/24 Minute Order (Dckt. Nos. 377–379).

On May 21, 2024, the jury found Howard guilty on three of the four counts. The jury convicted Howard on both counts about the 2018 incident. Specifically, the jury returned guilty verdicts on Count 1 (conspiracy to knowingly and intentionally possess cocaine with intent to distribute in July 2018), and on Count 2 (attempted possession of cocaine with intent to distribute in July 2018).

The jury returned a split verdict on the two counts about the 2017 incident. The jury convicted Howard on Count 3 (conspiracy to distribute cocaine in January 2017). *See* Verdict Form (Dckt. No. 400); 5/21/24 Minute Order (Dckt. No. 401); *see also* Superseding Indictment (Dckt. No. 101). But the jury acquitted Howard on Count 4 (distribution of cocaine in January 2017). *See* Verdict Form, at 5.

On June 4, 2024, Howard moved for a judgment of acquittal under Rule 29 or, alternatively, for a new trial under Rule 33. *See* Mtn. for Acquittal (Dckt. No. 408). The 12-page motion described itself as an "outline of the issues" that he would address more fully in a supporting memorandum. *Id.* at 1.

The briefing of that motion did not go smoothly. *See generally* 4/23/25 Order (Dckt. No. 460). The supporting memo did not arrive on the docket for eight months.

Under this Court's scheduling order, the supporting memo was originally due on July 31, 2024. *See* 5/21/24 Order (Dckt. No. 401). Howard sought a few extensions of the deadline, which this Court granted. *See* 8/2/24 Order (Dckt. No. 413). This Court ultimately reset the deadline for his supporting memo for December 9, 2024. *See* 12/2/24 Order (Dckt. No. 448). The government's response was due by January 6, 2025, and Howard's reply was due by January 20, 2025. *See* 12/2/24 Minute Order (Dckt. No. 448).

The deadline of December 9, 2024 for Howard's supporting memo came and went, and Howard filed nothing.

When the due date for the government's response rolled around, on January 6, 2025, the government filed a response brief. That is, the government filed a brief even though it had nothing to respond to, except Howard's original, skeletal motion for acquittal or a new trial filed on June 4, 2024. *See generally* Gov't's Resp. (Dckt. No. 451).

Howard then sought an extension of time to file a *reply*, even though Howard had never filed a supporting memo. *See* Def.'s Mtn. for Extension (Dckt. No. 453).

Finally, on April 8, 2025, over eight months after the initial deadline, Howard filed his supporting memorandum. *See* Def.'s Mem. (Dckt. No. 458). The memo arrived out of the blue, and developed in greater detail the arguments that appeared in Howard's original motion for acquittal from June 2024. *See generally* Mtn. for Acquittal (Dckt. No. 408).

The timing wasn't ideal. At that point, the sentencing hearing was only two weeks away, and the government hadn't had a chance to respond to the late-arriving brief. And there was a lot to respond to. Howard's supporting memorandum weighed in at almost 50 pages. *Id.*

This Court reset the sentencing hearing and granted the government leave to file a response. *See* 4/24/25 Order (Dckt. No. 464). The government later did so. *See* Gov't's Supp. Resp. (Dckt. No. 462).

At the end of the day, the late arrival of Howard's supporting memo is neither here nor there. It did not affect the outcome of this Court's decision. But it did affect the timing.

## Legal Standard

Rule 29 permits a defendant to challenge a conviction that lacks sufficient evidence. A court "must enter a judgment of acquittal" if the evidence presented at trial "is insufficient to sustain a conviction." *See* Fed. R. Crim. P. 29(a).

Because a Rule 29 motion seeks to set aside the jury's determination of guilt (or take the decision out of the jury's hands), a defendant must meet a high standard. "[A] defendant seeking a judgment of acquittal faces a 'nearly insurmountable hurdle.'" *United States v. Garcia*, 919

3

F.3d 489, 496–97 (7th Cir. 2019) (citations omitted).  That said, "the height of the hurdle depends directly on the strength of the government's evidence." *Id.*

A court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

A jury verdict deserves deference.  A court can "set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009).  In that vein, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009).

Rule 33 allows a defendant to move for a new trial.  The Rule 33 standard is more open-ended than Rule 29.  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." *See* Fed. R. Crim. P. 33 (emphasis added).

Unlike Rule 29, which focuses on the sufficiency of the evidence, Rule 33 applies more broadly.  "[C]ourts have interpreted [Rule 33] to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (citation omitted).

The standard under Rule 33 is less demanding than the standard under Rule 29, too.  "A defendant is entitled to a new trial if there is a *reasonable possibility* that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006) (emphasis added).

Similarly, a court "need not view the evidence in the light most favorable to the government and it may consider the credibility of the witnesses" in deciding a Rule 33 motion. *See United States v. Mireles*, 2022 WL 523118, at *4 (N.D. Ill. 2022) (Kendall, J.) (citing *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999)).

Nonetheless, a court's power to grant a new trial is "reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citing *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)).

At the end of the day, a court should grant a Rule 33 motion only if "the evidence 'preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand.'" *See United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

Analysis

The Court will start with the arguments about the sufficiency of the evidence, given that this Court hasn't addressed those arguments before. Then, the Court will briefly revisit Howard's objections that already received rulings before and during trial.

I.      **The Sufficiency of the Evidence**

Howard argues that the government offered insufficient evidence to convict him on any of the three counts. The Court will address each count one by one.

   A.      **Conspiracy to Possess with Intent to Distribute in 2018 (Count 1)**

In Count 1, Howard was convicted of conspiracy to knowingly and intentionally possess cocaine with intent to distribute in 2018. *See* Verdict Form, at 2 (Dckt. No. 400).

To sustain that conviction, the government needed to prove that "(1) the conspiracy as charged in Count 1 existed; and (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy." *See* Final Jury Instructions, at 19 (Dckt. No. 389) (cleaned up).

The evidence easily cleared that bar. The jury heard sufficient evidence to support a finding that Howard and his co-defendant, Fowobi George, conspired to acquire a distribution amount of cocaine.

The charged involved an alleged attempt to buy 10 kilograms of cocaine in a parking lot outside a furniture store. George acted as the middleman.

George testified at trial that he arranged a purchase of cocaine by Howard from a confidential source named Marcos. *See* Trial Tr., at 337–38 (Dckt. No. 426). The jury heard recordings of calls between George and Marcos about acquiring the cocaine. *Id.* at 329–337; Exs. 303, 304, 306, 309. The jury saw text messages between them, too. *See* Ex. 113.

George also testified about his communications with Howard. George and Howard discussed an amount, and a price, for Howard's purchase of the cocaine. They ultimately settled on $280,000 for 10 kilograms of cocaine, which was "agreeable to [Howard]." *See* Trial Tr., at 338 (Dckt. No. 426).

Specifically, George testified as follows:

> Q:   And what were you discussing with the defendant at that time?
>
> A:   At that point securing cocaine and him purchasing it.

\*      \*      \*

5

| | |
|---|---|
| Q: | Did you have discussions with the defendant regarding quantity? |
| A: | At some point we did. |
| Q: | And what was the quantity that was discussed? |
| A: | Between 5 and 10 kilos. |
| Q: | And ultimately what was the – what was agreed upon? |
| A: | 10. |
| Q: | 10 kilos of cocaine? |
| A: | Yes, sir. |
| Q: | And was there price discussed between yourself and the defendant? |
| A: | Yes. |
| Q: | And what was the price that was discussed? |
| A: | It was supposed to be $28,000 per. |
| Q: | Per kilo? |
| A: | Yes. |
| Q: | Okay. So for 10 kilos, that would be $280,000? |
| A: | Yes. |
| Q: | Was that price agreeable to the defendant? |
| A: | To the best of my recollection, yes. |
| Q: | And was the quantity agreeable to the defendant? |
| A: | Yes. |

*Id.* at 337:16 – 338:21.

Howard, George (the middleman), and Marcos (the seller) later met at a furniture store. *Id.* at 343. The jury watched a recording of what happened. *See* Ex. 315.

6

George referred to Howard by saying, "That's my friend right there." *See* Trial Tr., at 347 (Dckt. No. 426). George testified that he meant that Howard was the person who they were "there to meet." *Id.*

Howard then drove home, as captured on aerial footage. *See* Exs. 102a, 102b. Howard texted George, saying, "I only [sic] bringing half. I am really not feeling this situation." *Id.* at 348; Ex. 103.

At trial, George testified that he understood Howard's phrase "I only bringing half" to mean that Howard only planned to bring half the money. That is, Howard planned to bring only $140,000 instead of the full purchase price of $280,000. *See* Trial Tr., at 348–49 (Dckt. No. 426).

George texted a response to Howard, saying, "I have made it easier, just do the ten [kilograms] as agreed. You don't have to go anywhere to inspect." *See* Trial Tr., at 349 (Dckt. No. 426); Ex. 103. Howard seemed to agree and told George, "Come to the car." *See* Ex. 106-2.

Howard drove back to the parking lot of the furniture store. *See* Exs. 102a, 102b. Howard, George, and Marcos met in Howard's car. George got in the front passenger seat, and Marcos got in the backseat. *See* Trial Tr., at 350 (Dckt. No. 426).

The jury watched a video and saw a picture of a large amount of cash in Howard's backpack. *See* Ex. 201. The jury heard evidence that Howard "flung" a bag of money to Marcos. *See* Trial Tr., at 350–51 (Dckt. No. 426).

George described what happened once they got inside the car:

> Q: And what happened after Marcos and you got into the car?
>
> A. Marcos was just asking, "Where's the money? Where is the money? Where is the money?" And Mr. Howard, you know, gave a bag. And it happened so fast, really fast after, after that, before the police got there, really fast.
>
> Q: Who did he give the bag to?
>
> A: He flung it to Marcos. So, but like I said, it happened so fast. When he was, you know, giving it to Marcos, I kind of, you know, move so he can be able to, you know, comfortably give it to him. And while that was happening, the next thing we know was somebody said, "Police, police, police."
>
> \* \* \*
>
> Q: But the defendant gave the bag initially to Marcos in the back of the car?

7

    A:  Yes.

*Id.* at 350:20 – 351:6, 351:18-20.

  Before long, agents pulled up in multiple vehicles and surrounded Howard's car. The video captured Howard's reaction: "Police man fucking police man." *See* Exs. 312, 312-1.

  Based on the record as a whole, a rational jury could find that Howard and George conspired to possess cocaine with an intent to distribute. The jury heard testimony that Howard and George arranged a price and quantity for the transaction. They made an agreement, and they sought to arrange a time, place, and manner to do the deal. Howard then showed up with almost $140,000 in cash.

  A reasonable jury could find that Howard had an intent to distribute. The quantity itself spoke volumes. Ten kilograms of cocaine is a lot of cocaine.

  It is far beyond the amount that a single person could plausibly use. Trial testimony established that even one "kilogram of cocaine is a massive amount of – that's not personal use or a personal consumption amount. That's distribution amount." *See* Trial Tr., at 537 (Dckt. No. 427) (testimony of expert witness Agent Eric Balliet). A reasonable jury could find that someone buying *ten times* that amount had an intent to distribute.

  The physical evidence corroborated the evidence of a drug conspiracy. Agents searched Howard's home and seized a large quantity of cash in a file cabinet in Howard's bedroom. *See* Ex. 202. The cash totaled more than $100,000. *See* Trial Tr., at 99–100 (Dckt. No. 423) (testimony of DEA Special Agent Brooke Polus).

  That's a lot of cash for a bedroom. It bolsters the inference that Howard had plenty of cash on hand to buy lots of cocaine. The amount in the file cabinet ($106,180) was substantial.

  The amount was telling for another reason, too. Recall that Howard sent a text saying that he was "only bringing half," which George understood to mean that Howard was bringing only half of the purchase price. *See* Trial Tr., at 348–49 (Dckt. No. 426).

  Back home, Howard had $106,180 in a file cabinet. That's not quite half of $280,000 (*i.e.*, $140,000). But $106,180 is more than 75% of $140,000, so it represented the lion's share of the rest of the purchase price. The stack of cash totaling $106,180 corroborated an inference that Howard did have the other half of the money, or close to it.

  Agents also seized a handgun from Howard's residence, in the same file cabinet in his bedroom. *See* Trial Tr., at 100 (Dckt. No. 423). They recovered two magazines, too. *Id.* at 104. Agent Balliet testified that firearms are commonplace in drug trafficking and that handguns are particularly common at "the 5- to 10-kilo level." *See* Trial Tr., at 539 (Dckt. No. 427).

  Agents also seized a drug ledger in the file cabinet. *See* Gov't's Supp. Resp., at 5 (Dckt. No. 462); Trial Tr., at 542 (Dckt. No. 427); Ex. 207. Agent Balliet testified that drug ledgers are

8

evidence of drug trafficking, as traffickers use ledgers to keep track of their transactions and debts owed.  *See* Trial Tr., at 541 (Dckt. No. 427).

To be sure, Howard testified at trial that the cash in the file cabinet was for a down payment for real estate.  *See* Trial Tr., at 661–62 (Dckt. No. 428).  Howard also testified that the notebook contained notations about sports gambling, not drug dealing.  *Id.* at 665–66.

But the jury heard enough to reach a different conclusion.  Each of the items in the file cabinet – a big pile of cash, a handgun, and a drug ledger – could strengthen an inference that a person was engaged in a conspiracy to distribute drugs.  Collectively, they support that inference even more.  The physical proximity of the objects suggests that they were connected.  And cash, guns, and ledgers are common tools of the drug trade.

Maybe the inference wasn't compelling.  At best, they're bricks in a much bigger wall.  But on this record, a reasonable jury could have found that the cash, the gun, and the ledger were part of a conspiracy to distribute drugs.  Taken together, they supported an inference that Howard conspired to buy and distribute cocaine.

Howard argues that there was insufficient evidence to show that he entered into an agreement with George (the middleman).  And without an agreement, there can be no conspiracy.  *See United States v. Shabani*, 513 U.S. 10, 16 (1994) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.").

Howard says there was no agreement because he "was clear that he would not agree until saw [sic] the product on offer, which did not transpire."  *See* Def.'s Mem., at 33 (Dckt. No. 458).

In support of that view, Howard cites two lines recorded on Marcos's video footage of the cocaine transaction.  Howard said, "I just want to see my product [inspect the cocaine] . . . ."  *Id.* (citing Crim. Cplt., at ¶ 21(d) (Dckt. No. 1)); *see also* Trial Tr., at 352 (Dckt. No. 426).  According to Howard, he wanted to see the cocaine before agreeing to purchase it.  *See* Crim. Cplt., at ¶ 21(d); *see also* Trial Tr., at 363; Ex. 312.

Howard's argument doesn't get him very far.  Even if Howard wanted to see the cocaine before purchasing it, it wouldn't matter.

The government charged Howard with conspiracy.  The government didn't need to establish that Howard agreed *to purchase* the cocaine.  The government needed to prove only that he entered into an agreement in furtherance of the conspiracy *to possess* with intent to distribute.  The government could do that without showing that Howard agreed to go through with a deal *to purchase* the cocaine.

Conspiring to possess drugs is broader than agreeing to purchase drugs.  The circles overlap and form a Venn diagram, but they're not the same.  Someone can intend to possess something without sealing a deal to buy it.  The government did not need to produce the drug-deal equivalent of a bill of sale to show that someone conspired to possess cocaine.

9

Possession is not a technical concept. As the Court instructed the jury, a person has possession "if he knowingly has the ability and intention to exercise control over the object, either directly or through others." *See* Final Jury Instructions, at 27 (Dckt. No. 389).

Viewed as a whole, the record included more than sufficient evidence that Howard and George made an agreement in which they sought to possess cocaine with intent to distribute.

At best, Howard argues that he entered into a conditional agreement to buy the cocaine, and that a condition went unsatisfied. But "a conspiracy may be actionable, even though it is conditional." *United States v. Barta*, 776 F.3d 931, 940 (7th Cir. 2015) (quoting *United States v. Podolsky*, 798 F.2d 177, 178 (7th Cir. 1986)). After all, "[e]very conspiracy is conditional to some extent, for no one agrees to go through with an agreement no matter what." *Podolsky*, 798 F.2d at 178.

Howard cites no case law supporting the idea that failure of a condition defeats a conspiracy. An agreement with a condition is still an agreement. And an agreement with a condition still makes the substantive offense more likely to occur. *See United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991) (suggesting that a conspiracy to distribute is criminalized above and beyond the substantive offense of distribution because it "increase[s] the likelihood that the sale will take place").

In short, the jury heard enough evidence to support Howard's conviction on Count 1, even if some evidence suggests that he wanted to see the cocaine before purchasing it.

At trial, Howard asserted the public authority defense. The public authority defense is invoked by a "defendant [who] engages in conduct that the defendant knows to be otherwise illegal but [] has been authorized by the government." *See United States v. Stallworth*, 656 F.3d 721, 726 (7th Cir. 2011). It is a "rare defense[]." *See Norweathers v. United States*, 133 F.4th 770, 777 (7th Cir. 2025).

To be sure, the jury heard evidence that Howard was, in fact, a confidential informant. But the jury heard a bounty of evidence that Howard's attempt to buy the cocaine was not a controlled transaction authorized by Homeland Security Investigations ("HSI"). The jury heard lots of evidence that the alleged transaction wasn't on the up-and-up.

The government elicited testimony that Homeland Security Investigations did not authorize Howard to make a controlled purchase of cocaine in the parking lot outside the furniture store on July 2, 2018. *See* Trial Tr., at 414 (Dckt. No. 426) (testimony by Agent Morro). The transaction did not follow any of the protocols for a controlled purchase, and did not include any of the tell-tale signs, either.

For example, HSI did not have any record of any controlled purchase by Howard on that date. There was no supervisor approval, and there were no recording devices for a controlled purchase. And Howard's response when the police showed up – "Police man fucking police man" – isn't what you would expect if Howard was on Team Law Enforcement. *See* Exs. 312, 312-1.

The jury also heard testimony that HSI would not allow a confidential informant to use $240,000 of his own money to buy cocaine. *Id.* at 408–09, 415. HSI did not provide Howard with $240,000, either. *Id.* at 432.

For now, the point is not that Howard went rogue. The point is that the jury heard enough to reach the conclusion that Howard went rogue. That is, the government presented sufficient evidence to reject Howard's assertion of the public authority defense. At the end of the day, and at the end of the trial, the call was up to the jury.

Howard also argues that he engaged in a mere buyer-seller transaction. *See* Def.'s Mem., at 34 (Dckt. No. 458).

As an initial matter, Howard has likely waived that argument.

"An untimely post-trial motion that raises additional arguments not contained in previous, timely motions, cannot 'relate back' to the previous motions. A defendant is thus not permitted to raise additional arguments in an untimely motion . . . ." *United States v. Patterson*, 2007 WL 1438658, at *9 (N.D. Ill. 2007) (citing *United States v. Holt*, 170 F.3d 698, 702–03 (7th Cir. 1999)), *aff'd*, 397 F. App'x 209 (7th Cir. 2010).

Howard did not raise the buyer-seller doctrine in his original motion filed in June 2024 (*i.e.*, the 12-page "outline" of arguments). *See generally* Mtn. for Acquittal (Dckt. No. 408). And, as discussed above, the supporting memorandum was filed over eight months after the 14-day deadline to file a motion for acquittal. *See* Fed. R. Crim. P. 29(c)(1).

So the buyer-seller argument is both new and untimely. It is the kind of late argument barred by Rule 29's "inflexible" "claim-processing rule." *See Eberhart v. United States*, 546 U.S. 12, 19 (2005).

Without some form of excusable neglect, "[t]here is simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict motion for judgment of acquittal . . . ." *See Carlisle v. United States*, 517 U.S. 416, 420 (1996).

But even if Howard's buyer-seller argument is not waived, it is a poor fit for the facts of this case, given the identities of the buyer and seller. As the name implies, the buyer-seller doctrine is typically raised as a defense to an alleged conspiracy between a buyer and a seller. But here, Howard is alleged to have conspired with George, the middleman – *not* Marcos, the confidential-informant seller.

Recall that, in July 2018, George arranged a transaction in which Marcos would sell 10 kilograms of cocaine to Howard. *See* Trial Tr., at 338 (Dckt. No. 426). Marcos was a confidential source. *See* Trial Tr., at 209 (Dckt. No. 424).

As Howard points out in his brief, "an agreement with an agent of the police is not a criminal conspiracy." *See United States v. Viezca*, 265 F.3d 593, 598 (7th Cir. 2001) (quoting *United States v. Duff*, 76 F.3d 122, 127 (7th Cir. 1996)). So as a matter of law, Howard couldn't

11

conspire with Marcos, given that he was a confidential source. *See United States v. McClain*, 934 F.2d 822, 828 (7th Cir. 1991) (noting that a government informant "could not . . . conspire with anyone").

The indictment didn't allege a conspiracy between Howard and Marcos, the informant. Instead, the indictment alleged that Howard conspired with *George*. *See* Superseding Indictment, at 1 (Dckt. No. 101). The evidence at trial supported that conclusion.

George wasn't the buyer or the seller. He was a middleman or a "broker." *See* Trial Tr., at 337 (Dckt. No. 426). The essence of the buyer-seller doctrine is that a mere-buyer seller relationship should not give rise to conspiracy. *See Townsend*, 924 F.2d at 1394 ("A sale, by definition, requires two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate.").

But a relationship between a buyer like Howard and a middleman like George is different. That relationship *does* "increase the likelihood that the sale will take place." *Id.* That's what middlemen do – they connect buyers and sellers. They grease the wheels of sales.

So, the buyer-seller doctrine doesn't help Howard, because it wasn't the buyer-seller relationship that gave rise to the conspiracy. Instead, it was the relationship between the buyer and the middleman.

And even if the buyer-seller doctrine applied to the facts of this case, Howard relies on old law that has not stood the test of time.

Howard extensively cites *United States v. Colon* for the idea that buying or selling "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction." *Id.* at 35 (Dckt. No. 458) (citing *United States v. Colon*, 549 F.3d 565, 569–70 (7th Cir. 2008)).

But the Seventh Circuit has since overruled *Colon*. Last year, the Seventh Circuit sitting en banc in *United States v. Page* brought its buyer-seller jurisprudence "in harmony with [its] sister circuits." *See United States v. Page*, 123 F.4th 851, 862 (7th Cir. 2024) (collecting cases).

One of those sister circuits, the Fourth Circuit, has "repeatedly recognized that evidence of a *single* buy-sell transaction involving a '*substantial quantity* of drugs' can support a 'reasonable inference' of knowing participation in a distribution conspiracy." *See United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021) (emphasis added). The Seventh Circuit cited *Seigler* approvingly. *See Page*, 123 F.4th at 862.

As discussed above, 10 kilograms of cocaine is a distribution-quantity amount, and easily clears the bar for a "substantial quantity" from which a jury could draw the "'reasonable inference' of knowing participation in a distribution conspiracy." *Id.* Howard was not buying 10 kilograms of cocaine for personal use. When asked "[w]hat would happen if someone tried to consume a kilo of cocaine," expert witness Agent Balliet replied, "I think their heart would stop." *See* Trial. Tr., at 537 (Dckt. No. 427).

So, as the law currently stands, the buyer-seller doctrine does not stand in the way of the notion that Howard engaged in a conspiracy to possess with intent to distribute. *See Page*, 123 F.4th at 862. And that's assuming *arguendo* that the buyer-seller doctrine has any relevance to Howard and George's buyer-broker relationship to begin with.

In sum, the jury heard sufficient evidence at trial to support a conviction on Count 1.

**B.     Attempted Possession with Intent to Distribute in 2018 (Count 2)**

The jury also convicted Howard on Count 2, finding him guilty of attempting to knowingly and intentionally possess with intent to distribute cocaine in 2018. *See* Verdict Form, at 3 (Dckt. No. 400). The charge was about the same incident as the conspiracy count, meaning the attempted purchase of 10 kilograms of cocaine in the parking lot of the furniture store.

The elements of attempt are "(1) the intent to commit the substantive offense and (2) a substantial step toward committing that offense." *See United States v. States*, 72 F.4th 778, 785 (7th Cir. 2023) (citation omitted). A defendant must "*intend* to commit every element of the completed crime." *Id.* (emphasis in original) (citations omitted).

Here, the government needed to prove that Howard "(1) intended to possess a controlled substance and intended to distribute it to another person; (2) believed that the substance was some kind of a controlled substance; and (3) knowingly took a substantial step toward possessing a substance he believed to be a controlled substance, intending to possess it." *See* Final Jury Instructions, at 25 (Dckt. No. 389) (cleaned up).

The punchline is that the evidence that supported Howard's conviction on Count 1 (the conspiracy charge) also supported Howard's conviction on Count 2 (the attempted possession charge).

Howard repeats many of the same arguments. Howard says that he and George "never reached an agreement to purchase any specific amount of cocaine." *See* Def.'s Mem., at 40 (Dckt. No. 458).

The Court has already dealt with that argument. And Howard's argument fares even worse here, because, unlike conspiracy, attempt doesn't require an agreement.

Again, an agreement to *purchase* is not the same thing as an intent to possess. Someone can intend to possess something without sealing the deal. The government did not need to produce the drug-deal equivalent of equitable title. The government introduced sufficient evidence to show that Howard formed an intent to possess cocaine, even though some evidence suggests that Howard was unsure about going through with the deal.

Howard points out that he didn't bring enough money to complete the purchase of 10 kilograms. In his view, the fact that he didn't bring all of the money to the parking lot means that he never intended to possess all 10 kilograms of cocaine.

The jury heard that argument. The jury could have believed it. It didn't.

Again, the jury heard evidence that Howard negotiated a deal to purchase 10 kilograms of cocaine for $280,000. *See* Trial Tr., at 338 (Dckt. No. 426). But he brought only about half of that amount ($133,055) to the parking lot by the furniture store. *Id.* at 349; Def.'s Mem., at 39 (Dckt. No. 458) (citing Trial Tr., at 84 (Dckt. No. 423)).

Howard told George that the $133,055 was "only for half," and that he would "go grab the other hundred and forty." *See* Trial Tr., at 553 (Dckt. No. 427) (meaning the remainder of the $280,000 purchase price); Ex. 201. A rational jury could find that Howard *intended* to exercise control over all of the cocaine based on this evidence, even if the cocaine wasn't physically in his hands.

And Howard had more than $100,000 in cash at home. *See* Gov't's Supp. Resp., at 7 (Dckt. No. 462). That pile of cash supports the jury's reasonable inference that Howard intended to possess 10 kilograms of cocaine.

Moreover, drugs are often sold on consignment. Payment isn't always upfront. So a reasonable jury could have found that Howard intended to possess all 10 kilograms even though he ponied up only half of the money at first.

And even if Howard had enough money for only half of the cocaine, a reasonable jury could have returned a guilty verdict. The government didn't need to prove that Howard attempted to buy all 10 kilograms of cocaine. Count 2 charged Howard with attempting to possess "5 kilograms or more" of cocaine. *See* Superseding Indictment (Dckt. No. 101); Verdict Form, at 3 (Dckt. No. 400). Even if Howard attempted to possess only half of the 10 kilograms, that's five kilograms. And that's enough to sustain a guilty verdict.

Next, Howard argues that his case is like *United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995). In *Kitchen*, the defendant was convicted of possession. The defendant held cocaine for "two or three seconds," and was encouraged to "check out the merchandise." *Id.* at 519, 522.

As the Seventh Circuit later described, the defendant in *Kitchen* "was still considering his next action [as] demonstrated by his comment that he was worried about the purity of the merchandise." *See Stallworth*, 656 F.3d at 729 (citing *Kitchen,* 57 F.3d at 519–20). As a result, the evidence was "insufficient to establish possession, because it was uncertain that the defendant would complete the transaction and walk away with the drugs." *Id.*

Howard analogizes his case to *Kitchen*. He argues that his conviction for attempted possession should be reversed because he too "had not yet formed the intent to purchase." *See* Def.'s Mem., at 42 (Dckt. No. 458).

But the defendant in *Kitchen* was convicted of *possession*, not *attempted* possession. The Seventh Circuit reversed because the defendant never exercised possession over the cocaine, *not* because the defendant lacked intent to possess the cocaine, as Howard now argues. *See*

14

*Stallworth*, 656 F.3d at 729. Howard's case is different, because he was convicted of *attempted* possession.

Unlike the situation in *Kitchen*, the government here did not need to show that Howard actually or constructively possessed cocaine. Attempted possession doesn't require possession.

True, there never was any cocaine for Howard to possess, because Marcos (the informant) didn't bring any real cocaine to the transaction. *See* Trial Tr., at 42, 81 (Dckt. No. 423). But the lack of cocaine doesn't preclude an attempted possession charge. *See, e.g.*, *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir. 1993) ("Intent to obtain delivery of an illicit drug is a key element of the crime of attempted possession, and that intent may exist even where there are no drugs to be had.").

Howard also argues that he did not take a substantial step toward possessing cocaine. Again, Howard points to a supposed lack of a definitive agreement to purchase. And once again, a lack of a concrete purchase agreement does not matter.

"Determining what acts constitute a substantial step is a fact-intensive, case-specific inquiry." *See United States v. States*, 72 F.4th 778, 789 n.7 (7th Cir. 2023) (citing *United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010)). It must be "reasonably clear that had the defendant not been interrupted or made a mistake he would have completed the crime." *Id.*

The Seventh Circuit has explained that a "substantial step" is the "demonstration of dangerousness," and can be "usefully described as 'some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.'" *See United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008).

Here, Howard showed up to a drug deal with $133,055 in cash. Illegal drug transactions involving such sums and distribution-quantity amounts of cocaine are inherently "dangerous[]" interactions. *Id.*

Showing up to a drug deal with over $100,000 is a substantial step – if not a hop, a skip, and a jump – toward a purchase of the drugs. It's a pretty big step in the wrong direction. "[I]n the ordinary and likely course of things," those actions will lead to the completed crime of possession if they are not interrupted. *Id.*

Again, the jury heard evidence that Howard "flung" the bag of money at Marcos in the car. *See* Trial Tr. at 350–51 (Dckt. No. 426). So there is evidence Howard had completed his end of the transaction. He gave over the money, and he should have gotten the cocaine – the only problem was that there was no cocaine (and the police showed up).

If anything, the jury could have found that Howard went pretty far down the path, far beyond a "substantial step." And by any measure, the jury heard enough evidence to find that Howard took a "substantial step" toward possession of the cocaine.

15

Viewing the record as a whole, the evidence is more than sufficient to support a finding that Howard attempted possession with intent to distribute cocaine.

### C. Conspiracy to Distribute in 2017 (Count 3)

The jury reached a split decision about the 2017 incident. The jury convicted Howard on Count 3, finding that he conspired to distribute a controlled substance in 2017. *See* Verdict Form, at 4 (Dckt. No. 400). But the jury acquitted Howard on Count 4, the substantive offense of distribution. *Id.* at 5.

For Count 3, the government needed to prove "(1) the conspiracy . . . existed; and (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy." *See* Final Jury Instructions, at 36 (Dckt. No. 389).

The jury heard sufficient evidence at trial to support both elements.

At trial, Astrien Johnson, a government confidential source, testified that she sought to purchase $2,400 worth of cocaine. She asked her friend, Thomas Howard (no relation to Defendant Gary Howard), to help arrange a sale. *See* Trial Tr., at 179 (Dckt. No. 424). She testified that Thomas Howard acted as a "middleman" for the deal. *Id.* at 153.

On the day of the sale, she met Thomas Howard and Defendant Gary Howard in a parking lot, where she entered Defendant Howard's car. *Id.* at 155. In the car, she asked, "You got my stuff?" *Id.* at 182.

The jury heard evidence that Defendant Howard did have the "stuff" – two ounces of cocaine. At trial, Johnson testified about how the deal transpired. "[Defendant Howard] pulled the drugs out, passed them to Thomas, Thomas passed it to me, and I gave the money directly to [Defendant Howard]." *Id.* at 181.

They also discussed future drug deals. *See* Gov't's Resp., at 14 (Dckt. No. 451).

That's more than enough to establish that Defendant Howard made an agreement with Thomas Howard to sell cocaine. True, no conspiracy could exist between him and *Johnson* (the confidential source) because "an agreement with an agent of the police is not a criminal conspiracy." *See Viezca*, 265 F.3d at 598 (7th Cir. 2001) (quoting *Duff*, 76 F.3d at 127). But Defendant Howard could conspire with Thomas Howard (the middleman).

The jury heard enough evidence to support a finding that Defendant Howard reached an agreement with Thomas Howard to sell cocaine to Johnson. The jury heard evidence that the sale took place through a "middleman," meaning Thomas Howard. *See* Trial Tr., at 153 (Dckt. No. 424). The jury heard enough to support an inference that they worked together to "deliver[] or transfer[] possession of the controlled substance to someone else." *See* Final Jury Instructions, at 30 (Dckt. No. 389).

Maybe that's not the most compelling conclusion. And it wasn't the only possible inference, by a long shot. But taking the evidence in the light most favorable to the government, a rational jury could conclude that Defendant Howard made an agreement with Thomas Howard with the end goal of distributing cocaine.

Howard's primary argument against his conviction on Count 3 is that his guilty verdict on Count 3 (conspiracy to distribute) is "inconsistent" with his acquittal on Count 4 (the substantive distribution offense). *See* Def.'s Mem., at 45 (Dckt. No. 458). So he thinks that Count 3 "should be reversed" as a result. *Id.*

But that argument is a non-starter. "Regardless of how the apparent inconsistency in a jury's determination presents itself, it is well established that '[i]nconsistent verdicts in a criminal case are not a basis for reversal of a conviction or the granting of a new trial.'" *See United States v. Askew*, 403 F.3d 496, 501 (7th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 270 F.3d 1158, 1168 (7th Cir. 2001)).

As the Supreme Court has stated, "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." *Harris v. Rivera*, 454 U.S. 339, 345 (1981) (noting this rule's application to instances of "inconsistency between verdicts on separate charges against one defendant"); *see also McElrath v. Georgia*, 601 U.S. 87, 97 (2024) (same); *Yeager v. United States*, 557 U.S. 110, 112 (2009) ("[A] logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict.") (citing *Dunn v. United States*, 284 U.S. 390, 393 (1932)).

The rule that "an acquittal on one count does not invalidate a guilty verdict on another" applies "[e]ven when the jury's decision is inscrutable." *See United States v. Bahena*, 71 F.4th 632, 639 (7th Cir. 2023) (quotations and citations omitted). After all, a jury might render a verdict for "reasons other than a determination of innocence, such as mistake, compromise, or lenity." *See Reyes*, 270 F.3d at 1168.

And even then, the verdicts are not necessarily inconsistent. The jury could have found that Thomas Howard, not Defendant Howard, was the seller. After all, Thomas Howard passed the drugs to Johnson.

Maybe the jury found that Thomas Howard, not Defendant Howard, sold the drugs because Thomas Howard was the one who handed the drugs to Johnson. That conclusion would not undercut the existence of a conspiracy. Maybe the jury concluded that Thomas Howard and Defendant Howard conspired, and that Thomas Howard sold the drugs to Johnson with Defendant Howard's help.

Once again, Howard seeks to invoke the buyer-seller rule. The buyer-seller rule exists to prevent "a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs." *See Page*, 123 F.4th at 862 (quoting *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc)).

But Defendant Howard and Thomas Howard were not engaged in a sale amongst themselves. The jury heard evidence that Defendant Howard gave the drugs to Thomas Howard, the middleman, and that Thomas Howard gave the drugs to Johnson. *See* Trial Tr., at 153 (Dckt. No. 424). Based on that evidence, the jury could find the existence of a conspiracy.

In sum, the government presented sufficient evidence to support Howard's conviction for conspiracy to distribute cocaine in 2017. Count 3 stands.

**II.     Procedural Arguments**

Howard also renews a number of procedural and evidentiary arguments that he raised before and during trial.

Judge Lee and this Court exhaustively addressed each of those issues in prior orders. This Court took another look at those rulings, and sees no reason to land in a different place.

**Conclusion**

For the foregoing reasons, Defendant's motion for acquittal or, in the alternative, for a new trial (Dckt. No. 408) is hereby denied.

Date:  June 3, 2025

　　　　　　　　　　　　　　　　　　　　　Steven C. Seeger
　　　　　　　　　　　　　　　　　　　　　United States District Judge